## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| ABBOTT LABORATORIES and ABBOTT RAPID DX NORTH AMERICA, LLC,<br><br>                    Plaintiffs,<br><br>    v.<br><br>JUSTIN BROWN,<br><br>                    Defendant. | Case No. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Abbott Laboratories and Abbott Rapid Dx North America, LLC f/k/a Alere North America, LLC (collectively, "Abbott"), by and through their undersigned counsel, bring this Complaint against Defendant Justin Brown ("Brown") and hereby allege as follows:

## INTRODUCTION

1.    Abbott brings this action to stop its former employee Brown from fraudulently claiming that he is still employed by Abbott or authorized by Abbott to sell any diagnostic test and testing equipment, including COVID-19 diagnostic tests and testing equipment, and from unlawfully trading on Abbott's name, reputation, and goodwill.

2.    On April 13, 2020, Brown, a Sales Representative for Abbott's Rapid Diagnostic ("ARDx") business unit was terminated for falsifying expense reports. Abbott had also uncovered that Brown had been secretly working for another company at the same time he worked at Abbott, which conflicted with his obligations to Abbott.

3.    Unbeknownst to Abbott, on April 15, 2020, Brown registered the domain name "abbottdx.com" and created the email account "justin.brown@abbottdx.com," which he uses to

contact and solicit Abbott's customers under the guise that he still works for Abbott and sells Abbott-sanctioned products.

4.      Brown has refused to return his Abbott-issued laptop, and he is using Abbott confidential information and trade secrets—including contact information for Abbott's customers and his old Abbott emails—to solicit Abbott's customers.  Without authorization, Brown uses Abbott's trademarked name and logo in an email signature block that is nearly identical to the email signature designed by Abbott for use by its employees.

5.      When Abbott demanded that Brown cease his unlawful activity and breach of his employment agreement, Brown represented that he was out of the county and not returning for at least two months. He was photographed at his home, which is in the United States, days later. He also promised to identify the companies with which he had been working, but his disclosures were demonstrably false. He indicated he lacked Abbott files, but he had used multiple Abbott email files in the weeks and days before.

6.      Brown also falsified his military leave in 2019 while employed by Abbott. Abbott asked the Naval Criminal Investigative Service ("NCIS") to confirm whether Brown was on a military leave from May through November 2019, as Brown had claimed. In response, NCIS indicated that Brown had not been affiliated with the military since 2008, which means Brown wrongfully collected $23,749 from Abbott in undeserved military-leave pay.

7.      Abbott brings this action for (i) infringement of registered trademarks in violation of the Lanham Act, 15 U.S.C. § 1114; (ii) counterfeiting in violation of the Lanham Act, 15 U.S.C. § 1117; (iii) false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a); (iv) dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c); (v) cyberpiracy in violation of the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d);

(vi) misappropriation of trade secrets in violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA"); (vii) breach of contract; (viii) common law fraud; and (ix) unjust enrichment. Abbott seeks preliminary and permanent injunctive relief to enjoin Brown's repeated and flagrant unlawful conduct.

**PARTIES**

8.     Abbott Laboratories is an Illinois corporation with its principal place of business in Abbott Park, Illinois.  Abbott is a global healthcare company and worldwide leader in diagnostics, including diagnostic tests and testing equipment for the Coronavirus Disease 2019 ("COVID-19").

9.     Abbott Rapid Dx North America, LLC, is a Delaware limited liability company with its principal place of business in Abbott Park, Illinois.  It is an indirectly wholly owned subsidiary of Abbott Laboratories.

10.     Defendant Justin Brown is an individual who was employed by Abbott until April 13, 2020, when he was terminated for falsification of expense reports.  Upon information and belief, Brown is a resident and citizen of Florida.

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction over the claims asserting violations of the Lanham Act, the ACPA, and the DTSA under 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the remaining state law claims under 28 U.S.C. § 1367 because those claims are so closely related to Abbott's federal law claims that they form part of the same case or controversy.

12.     This Court independently has subject matter jurisdiction under 28 U.S.C. § 1332(a) because Abbott, an Illinois citizen, and Brown, a Florida citizen, are citizens of different states, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

13.     This Court has personal jurisdiction over Brown because, pursuant to his employment agreement with Abbott, Brown stipulated and consented to this Court's personal jurisdiction over him and waived the right to object to that jurisdiction for this dispute. Exhibit 1 ¶ 16(a).

14.     Venue is proper in this Court because Abbott and Brown "irrevocably agree[d] that all claims" in any action "arising out of or relating to" Brown's employment with Abbott or his employment agreement "shall be heard and determined in … the Northern District of Illinois federal courts." Exhibit 1 ¶ 16(a).

## FACTS

### Abbott's Industry-Leading Diagnostics Division

15.     The name Abbott is derived from the surname of Wallace Abbott, a nineteenth-century Chicago physician who founded the company in 1888.  For over 130 years, Abbott has been conducting business under this name in the United States and worldwide.

16.     Abbott is well known for its pioneering research and development of equipment in the field of diagnostics.  Abbott has a rich history of innovation and trustworthiness in diagnostics; for example, Abbott developed the world's first HIV blood test in the 1980s during the HIV/AIDS crisis in the United States.

17.     Within its diagnostics business, Abbott offers core laboratory diagnostics, molecular diagnostics, point-of-care diagnostics, and rapid diagnostics.  Abbott has collected one of the world's largest viral sample libraries and developed diagnostics that screen 60 percent of the world's blood supply.  More than 60 million tests are run on Abbott diagnostic instruments worldwide every day.

18.     Abbott is a recognized global leader in point-of-care testing: tests administered at the time and place that the patient is seen.  In 2019 alone, Abbott delivered more than one billion point-of-care tests to healthcare professionals and patients around the globe.

**Abbott's Groundbreaking and Unparalleled
COVID-19 Diagnostic Tests and Testing Equipment**

19.     Abbott's industry-leading diagnostics division has enabled the company to play a key role in the global fight against the COVID-19 pandemic.  As soon as the virus began to spread, Abbott initiated its efforts to develop and release COVID-19 diagnostic tests and testing equipment.  Since the pandemic began, Abbott has developed and brought to market numerous diagnostic tests and testing equipment for detecting COVID-19 and the antibodies that form during the immune response.

20.     In March 2020, Abbott released the first of its U.S.-authorized molecular diagnostics tests designed to detect the presence of the COVID-19 virus itself.  Abbott adapted its existing m2000 testing system, one of the most comprehensive infectious disease platforms in world history, to run its COVID-19 diagnostic tests in laboratories and hospitals.  The product received emergency-use authorization from the U.S. Food and Drug Administration ("FDA") on March 18, 2020.

21.     On March 26, 2020, Abbott gained U.S. authorization for its second COVID-19 diagnostic test, the molecular diagnostic test ID NOW, which also runs on an existing Abbott diagnostic platform.  ID NOW is a small point-of-care test, which detects the presence of the virus using a sample collected by nasal swab.  Abbott has shipped more than 15 million COVID-19 ID NOW diagnostic tests.

22.     On April 25, 2020, Abbott gained U.S. authorization for its serology (blood) test, which detects the presence of antibodies generated by the immune system during and after

COVID-19 infection. Abbott's serology test runs on its Architect and Alinity systems. Abbott has shipped more than 14 million COVID-19 serology tests.

23.     Abbott adapted its existing test platforms, including the m2000, ID NOW, Architect, and Alinity test processing systems, which were already in use to test for other diseases, to test for COVID-19. These existing platforms represent decades of diagnostic expertise and millions of dollars in research and development.

24.     In addition to adapting its existing test platforms, Abbott has used its experience and resources to develop new diagnostics instruments—especially in the rapid diagnostics field. On August 26, 2020, Abbott gained U.S. authorization to release its newest COVID-19 diagnostic test, BinaxNOW: a miniaturized testing device, approximately the size of a credit card, which costs only five dollars and provides results in 15 minutes. The following day, the U.S. Department of Health and Human Services ("DHS") announced a large purchase of BinaxNOW from Abbott, praising the product as "game-changing" and predicting that it will greatly enhance public officials' ability to track the virus.

25.     Building on over a century of work to become a world leader in diagnostics, Abbott is now in the small top tier of companies producing high-quality and reliable COVID-19 diagnostic tests and testing equipment. Customers including DHS recognize and rely on Abbott's COVID-19 diagnostic tests and testing equipment as backed by 130 years of unparalleled scientific expertise and quality control.

### Abbott's Registered and Incontestable Trademarks

26.     Abbott promotes its products, including its COVID-19 diagnostic tests and testing equipment, using trademarks that are registered and have been established as incontestable with the United States Patent and Trademark Office ("USPTO"). Healthcare professionals and other

members of the public recognize Abbott's marks and associate them with high-quality and reliable products, including in the field of medical diagnostics.

27.     Abbott has registered and owns the domain name www.abbott.com, which is Abbott's home website and describes its global products and services, including diagnostic testing for diseases such as COVID-19.

28.     Abbott's employees use email addresses associated with the domain name abbott.com.  These email addresses typically comprise of the employee's first name and last name, separated by a period (i.e., firstname.lastname@abbott.com).  Abbott uses this domain name in communications with its customers, including when Abbott promotes and sells its diagnostic tests and testing equipment.

29.     Abbott promotes and sells its many diagnostic tests and testing equipment under trademarks that are registered with the USPTO.  Abbott trademarks relevant to this dispute, and the details relating to their registration, are as follows:

| Mark | Reg No. (Reg. Date) | Goods and/or Services |
|---|---|---|
|  | 1,542,129 (June 6, 1989) | Diagnostic reagents for in vitro laboratory use. Diagnostic test kits consisting of reagents for the diagnosis of various human diseases; medical nutritional supplements. Automated diagnostic clinical laboratory apparatus and computer programs therefor. Catheters Booklets and textbooks concerning medical education Business management consulting services rendered to health care providers Educational services - namely, conducting courses in the field of medicine. |

7

| ABBOTT | 4,023,123 (Sept. 6, 2011) | Chemical reagents, namely, reagent strips for body fluid testing for use in the scientific research industry; control solutions and control reagents for use with scientific apparatus and instruments for quality control and calibration purposes. |
|---|---|---|
| | | Chemical reagents, namely diagnostic medical reagent strips for use by individuals to test their own body fluids and for use by the medical profession. |
| | | Computer communications hardware for connection to a medical test instrument data storage memory and to a computer for downloading stored data to the computer and computer software, sold therewith, for displaying the downloaded data; computer software used to manage point of care diagnostic instrument test results. |
| | | Medical diagnostic apparatus used to detect and measure the level of substances in body fluids; lances, lancets and lancing devices and body fluid monitoring, diagnostic and testing apparatus and instruments and diagnostic kits containing test strips, test meter and control solutions; apparatus for measuring dosages and delivering pharmaceuticals, namely, medical pumps and pens. |
| | | On-line health and medical services, namely, providing an interactive database for exchange of information between a medical device user and healthcare providers, delivered via a global computer network. |
| ABBOTT | 3,842,268 (Aug. 31, 2010) | Reagents for scientific and medical research use; genetic diagnostic kits composed of DNA probes, reagents and antibodies for scientific research. |
| | | Medical diagnostic reagents; genetic diagnostic kits composed of DNA probes, detection reagents and antibodies for use in clinical medicine. |
| | | Integrated system comprised of a computer, color monitor, optical disk drive and photographic printed. |
| | | Medical diagnostic instruments, namely, sample handlers, sample preparation equipment, equipment for testing bodily fluids for medical diagnosis. |

| ABBOTT | 3,842,269 (Aug. 31, 2010) | Computerized software programs for use in connection with a system for analyzing blood. |
| | | Blood analyzing instrument for medical diagnostic purposes and disposable cartridges and reagents for use therein. |
| | | Instruction manuals for use with a computerized blood analysis system consisting primarily of a portable blood analyzer, a computer, computer software, and a portable printer. |

Registration Nos. 3,842,268, 3,842,269, and 4,023,123 are collectively the "Abbott Word Marks."

Registration No. 1,542,129 and the Abbott Word Marks are collectively the "Abbott Marks."

30.     Each of the Abbott Marks is a valid and enforceable trademark owned by Abbott. Further, each of the Abbott Marks is incontestable under federal law. The registration certificates for each of the Abbott Marks are attached hereto as Exhibits 2–5.

31.     The continuous use of the Abbott brand for more than a century has established Abbott as one of the world's leading healthcare brands, recognized by patients, health care professionals, and other users or consumers of Abbott products around the globe.

32.     Abbott has invested significant time, effort, and money—indeed, millions of dollars—in developing and promoting its business under the Abbott Marks. Abbott advertises across hundreds of different media channels across multiple media formats, including digital media, print, and television.

33.     Abbott specifically uses the Abbott Marks to promote and sell its diagnostic tests and testing equipment. As with its other diagnostic products, Abbott has invested considerable resources towards marketing its COVID-19 diagnostic tests and testing equipment. Abbott's COVID-19 diagnostic tests have been the subject of considerable digital marketing efforts through social media, Abbott's website, news sites, and other avenues.

9

34.     Abbott also markets its diagnostic tests and testing equipment through various sales channels.  Abbott's sales organization, which comprises thousands of salespeople, is tasked with promoting and selling its diagnostic products.  This salesforce uses Abbott's reputation as a trusted name in healthcare and medical diagnostics to promote and sell its products to a network of health clinic, hospitals, doctors' offices, public-sector healthcare consumers, and other end users.  This salesforce has been mobilized and is currently devoted to selling Abbott's authorized COVID-19 diagnostic tests and testing equipment, both in the United States and abroad.

### Brown's Employee Agreement with Abbott

35.     Abbott's predecessor, Alere Inc., hired Brown in November 2015. After Abbott purchased Alere Inc., Abbott hired Brown.  In connection with his hiring, Brown executed an Employee Agreement that governed his employment.  Brown's Employee Agreement is attached hereto as Exhibit 1.

36.     The Employee Agreement obligated Brown to return Abbott's property upon his termination from Abbott, including its intellectual property.   Specifically, Section 6 of the Employee Agreement provides:

6.     **Return of ABBOTT Property.** Prior to terminating employment from ABBOTT (or otherwise upon request by ABBOTT), EMPLOYEE shall return all ABBOTT property, and shall not retain any copies, reproductions, abstracts or summaries of the property.  ABBOTT property includes, but is not limited to, all identification badges, passwords, access cards or codes, keys, automobiles, computers, telephones or other equipment, memoranda, notes, records, reports, files or other documents, photographs, drawings, plans, papers, computer software, compounds, customer and client lists, products/inventory and materials, as well as ABBOTT intellectual property made or compiled by or made available to EMPLOYEE during the course of employment with ABBOTT, and any copies, summaries or abstracts thereof, whether in electronic, paper or other form and whether or not they contain Confidential Information, as well as any telephone numbers maintained by ABBOTT.

37.     Section 8 of the Employee Agreement requires Brown to protect Abbott's

Confidential Information:

8.     **Non-Disclosure of Confidential Information.** EMPLOYEE acknowledges and agrees that EMPLOYEE has no right, title or ownership in Confidential Information unless otherwise expressly granted in writing by ABBOTT's Chief Patent Counsel or his/her designee. EMPLOYEE shall use all best efforts to protect the secrecy and confidentiality of all Confidential Information, including, as applicable, such efforts and measures as set forth in ABBOTT policies, procedures and guidelines. EMPLOYEE shall not, during the term of employment with ABBOTT or thereafter, use or disclose, or assist in the disclosure to or use by others, directly or indirectly, any Confidential Information, except as required and authorized in the scope of EMPLOYEE's job responsibilities and in the furtherance of ABBOTT's business (to the extent consistent with applicable confidentiality obligations between ABBOTT and third parties). EMPLOYEE acknowledges and agrees that prior written authorization by ABBOTT is required in accordance with ABBOTT policy before Confidential Information is submitted by EMPLOYEE for possible publication or dissemination. EMPLOYEE acknowledges and agrees that the relationship of EMPLOYEE to ABBOTT with respect to Confidential Information shall be fiduciary in nature.

Section 2(d) of the Employee Agreement defines the term "Confidential Information":

"Confidential Information" means information received by ABBOTT (or provided to EMPLOYEE while employed by ABBOTT) in any form (tangible or intangible) that is not generally known to the public by proper means, including, but not limited to: (i) all discoveries, inventions, improvements and innovations, whether or not patentable or copyrightable, product designs, methods, processes, techniques, shop practices, formulae, compounds, compositions, organisms, computer software, equipment, research and development data, clinical and pharmacological data, patient data, technical data, marketing, pricing and sales information, customer and prospective customer lists, material sourcing information and lists, business practices, methods and strategies, marketing plans and strategies, buying practices, financial data, operational data, plans and all other know-how, trade secrets, intellectual property and proprietary information; and (ii) information about the business affairs of third parties (including, but not limited to, customers, distributors, suppliers, acquisition targets, joint ventures, and licensing partners) that such third parties provide to ABBOTT in confidence, as well as information received by ABBOTT under an obligation of confidentiality to any third party.

38.     Section 9 of the Employee Agreement contains Brown's obligations not to compete

with Abbott for twelve months after his termination:

9.      **Non-Competition.** EMPLOYEE shall not, during EMPLOYEE's employment and twelve (12) months after EMPLOYEE's termination for any reason, in each country in which ABBOTT conducts business, except as expressly authorized in writing in advance by the ABBOTT Divisional Vice President & Associate General Counsel, Litigation or his/her designee:

(a)     participate in, manage, supervise, or provide services to a Competing Business: (i) that are the same as or similar in function or purpose to any services EMPLOYEE provided to ABBOTT during the last two years of EMPLOYEE's employment with ABBOTT; or (ii) that are otherwise likely to result in the use or disclosure of Confidential Information, notwithstanding EMPLOYEE's undertaking to the contrary;

* * *

(d)     directly or indirectly, promote or market any Competing Products to any ABBOTT Customer, or solicit any ABBOTT Customer or Covered Supplier for any purpose related to Competing Product; or

(e)     knowingly induce or encourage an ABBOTT Customer or a Covered Supplier to cease, interfere with or reduce business activity conducted with ABBOTT.

EMPLOYEE agrees and acknowledges that subsections (d) and (e) are reasonably limited in geography by their nature to those places or locations where the ABBOTT Customers and Covered Suppliers are located and do business, and if such geographic limit is insufficient under applicable law, then the restrictions in Section 9 shall be considered limited to the EMPLOYEE's assigned location or territory, which depending on EMPLOYEE's position, could extend to the United States and each additional country where ABBOTT does business.

39.     Brown also acknowledged in Section 11 of the Employee Agreement that Abbott

will face irreparable injury in the event of a breach or threatened breach of the Agreement:

11.     **Breach and Remedies.** In the event of Employee's breach or threatened breach of any portion of this Agreement, Employee acknowledges and agrees that:

***

12

(c)     The restrictive period in Section 9 (Non-Competition), 10 (Non-Solicitation of Employees) and 13 (Notifications to Abbott and New/Potential Employer) shall be extended by the length of time that Employee violates any of those section(s).

(d)     Abbott will face irreparable injury which may not be reasonably possible to calculate in dollar terms, and that in addition to other remedies available, Abbott shall be entitled to injunctions enjoining such breach or threatened breach by Employee, Employee's agents or representatives, or any other persons or entities acting for or with Employee. Employee further acknowledges and agrees that in addition to any other rights and remedies, Abbott shall be entitled to damages, attorneys' fees and all other costs and expenses reasonably incurred by Abbott in enforcing this Agreement.

### **Brown's Misconduct and Subsequent Termination from Abbott**

40.     In 2019, Brown held a position as a Strategic Business Executive within Abbott's ARDx business unit. Brown's job responsibilities included contacting and interacting with Abbott's customers to promote and sell Abbott's diagnostic products.

41.     Between March and May 2019, Brown's manager uncovered irregularities in Brown's expense reporting, which she deemed sufficiently serious to report and which resulted in further investigation by Abbott.

42.     In May 2019, before Abbott could interview Brown about the evidence uncovered during the investigation, Brown informed Abbott that he would need to take a military leave to fulfill his obligations the United States Navy Reserve. Brown was on leave from Abbott from May through November 2019, and he received $23,749.65 in compensation from Abbott during that time, pursuant to Abbott's applicable military-leave policy.

43.     When Brown returned from his leave in November 2019, Abbott interviewed Brown about the irregularities that his manager had reported. Abbott asked Brown about his use of Abbott company credit cards and submission of expense reports. Brown did not offer a reasonable explanation for his apparent violations of company policies.

44.     During Abbott's investigation, Abbott became aware of evidence that Brown was not deployed with the Navy Reserve while on leave, but instead working for a company based in Austin, Texas, identified as CSA Service Solutions, later known as Equipment Management Service and Repair (EMSAR).  For example, on November 21, 2019, Brown received an email from the Vice President of Operations at EMSAR who introduced Brown as EMSAR's National Strategic Accounts Manager and stated that Brown would be the best resource for competitive intelligence.  In addition, Abbott personnel found a business profile on zoominfo.com that identified Brown as a "Manager, National Strategic Accounts" of EMSAR.

45.     Abbott contacted NCIS to ask whether Brown had taken a military leave due to deployment by the Navy between May and November 2019, as Brown had claimed.  NCIS did not respond before the conclusion of Abbott's investigation.  When NCIS eventually responded, it stated that Brown had not been affiliated with the Navy since 2008.

46.      At the conclusion of Abbott's investigation, Abbott decided to terminate Brown effective April 13, 2020.  Abbott has not rehired Brown as an employee since his termination, nor has Abbott retained Brown's services in any other capacity.

47.     After Brown's departure, Abbott made multiple attempts to collect its property in Brown's possession, but Brown did not comply.  Among other things, Brown refused to return his Abbott-issued laptop and the confidential information contained on the laptop, all in breach of his Employee Agreement.

48.     After Abbott learned from NCIS that Brown had not taken a military leave, Abbott sought to collect from Brown the $23,749.65 that he wrongfully collected in military leave pay. Brown has not reimbursed Abbott for any of that amount and continues to claim that he was on military leave despite NCIS's confirmation that his claim is false.

14

**Brown's Post-Termination Conduct**

49.     When Brown worked at Abbott, Abbott authorized Brown to use the email address justin.brown@abbott.com.   After Brown's termination, he was no longer permitted to use that email address, and the account was disabled.

50.     Without Abbott's knowledge or authorization, on April 15, 2020, Brown registered the domain name "abbottdx.com" and created the email address "justin.brown@abbottdx.com." He then began using this email account and an email signature containing Abbott's trademarked name, trademarked logo, and the actual address of Abbott's offices in Orlando, Florida, which Brown designed to imitate the email signature of true Abbott employees.

51.     On April 15, 2020, two days after his termination, Brown emailed an employee of HealthTrust, one of Abbott's customers, whom Abbott believes Brown met through his work at Abbott.   To initiate the contact, Brown replied to a previous email chain from September 2019 between himself and the customer that occurred while he was employed by Abbott, to give the impression that his outreach was a continuation of his Abbott duties and authorized by Abbott. Brown used, without authorization, a version of his email signature from when he was previously employed at Abbott, falsely representing that he was still employed as a "Manager, Enterprise Accounts" at Abbott:



Brown, falsely claiming to represent Abbott and its interests, asked the HealthTrust employee whether she needed N95 masks, saying, "We are exploring a short-term disaster response to add 3M masks (8210 and 1860 models) for purchase at a right slightly below competitive market rates. We have not yet imported the masks, just testing the possible demand."

52.    The HealthTrust employee responded expressing interest in purchasing N95 masks. Brown then emailed her from his newly-created email account, justin.brown@abbottdx.com, using this slightly-modified email signature reflecting his new email address but still falsely representing that he was employed as a "Manager, Enterprise Accounts" at Abbott:



| **Abbott** | **Justin Brown, MSIE**<br>Manager, Enterprise Accounts<br>Abbott | Abbott<br>30 S. Keller Road<br>Orlando, FL 32810 | M:1+ 904-553-7144<br>justin.brown@abbottdx.com |

53.    Brown contacted the same HealthTrust employee again on September 8, 2020, from justin.brown@abbottdx.com, attempting to sell non-Abbott COVID-19 diagnostic testing products.  He used the following email signature, this time falsely representing that he was a "Director, Corporate Accelerator" at Abbott:



| **Abbott** | **Justin Brown, MBA**<br>Director, Corporate<br>Accelerator | Abbott Dx<br>30 S. Keller Road<br>Orlando, FL 32810 | M:1+ 904-553-7144<br>justin.brown@abbottdx.com |

54.    The HealthTrust employee corresponding with Brown forwarded Brown's emails to several colleagues and explained, "I received the below email from Justin Brown from Alere/Abbott."

55.    On April 15, 2020, Brown used the email address justin.brown@abbottdx.com to contact an employee of Johns Hopkins Medicine, an Abbott customer whom Abbott believes Brown met through his work at Abbott.  Brown used the same tactic as he did with HealthTrust, replying to an email chain from February 2019 between himself and the client when he was employed by Abbott.  Brown used the following email signature, falsely representing that he was a "Manager, Enterprise Accounts" at Abbott:



**Justin Brown, MSIE**

Manager, Enterprise Accounts
Abbott

Abbott
30 S. Keller Road
Orlando, FL 32810

M:1+ 904-553-7144

justin.brown@abbottdx.com

56.     Brown contacted Johns Hopkins Medicine again on August 25, 2020, claiming to have a "new role" at Abbott "working with developing technologies that fill our menu gaps at Abbott." Brown attempted to sell the customer a COVID-19 diagnostic testing device made by "Bloom Diagnostics," "a small, privately funded company from Vienna." Brown used the following email signature, falsely representing his new role as a "Director, Global Technologies" at Abbott.



**Justin Brown, MBA**

Director, Global Technologies

Abbott Dx
30 S. Keller Road
Orlando, FL 32810

M:1+ 904-553-7144

justin.brown@abbottdx.com

57.     On July 15, 2020, Brown used the email address justin.brown@abbottdx.com to contact an employee of Advent Health, an Abbott customer whom Abbott believes Brown met through his work at Abbott. Brown used the following email signature, falsely reflecting his role as a "Director, Global Accounts" at Abbott:



**Justin Brown, MBA**

Director, Global Accounts

Abbott Dx
30 S. Keller Road
Orlando, FL 32810

M:1+ 904-553-7144

justin.brown@abbottdx.com

Brown claimed to "have a new position working globally with emerging technologies." His email said, "We are partnering with Bloom Diagnostics for piloting a new device and list of assays," and asked the customer whether she was interested in the new device and accompanying assays.

58.     This Advent Health employee responded on September 17, 2020, asking Brown, "Can you confirm you still work for Abbott? Thanks." Brown replied, "I'm doing more

independent work now," and falsely stated, "Abbott is one of the diagnostic product lines that we carry." The customer responded, "I saw your email was Abbott, and you had the logo, but heard you weren't with Abbott anymore. I was confused." Brown falsely stated, "I activated twice over the last 18 months in the Navy reserves. Each time I was reassigned to different jobs. The most recent assignment is very interesting and allows me to work with new technologies, which I sent to you earlier in the summer."

59.     On September 8, 2020, Brown used the email address justin.brown@abbottdx.com to contact an employee of Stat Technologies, an Abbott customer whom Abbott believes Brown met through his work at Abbott. Brown used the following email signature, falsely representing that he was a "Director, Corporate Accelerator" at Abbott:



| ![Abbott] | **Justin Brown, MBA**<br><br>Director, Corporate<br>Accelerator | Abbott Dx<br>30 S. Keller Road<br>Orlando, FL 32810 | M:1+ 904-553-7144<br><br>justin.brown@abbottdx.com |

Brown claimed to be in a "new position, working in the corporate accelerator which helps promising new technologies get to market." Brown stated that he was "working with two emerging product lines, both involve COVID-19 testing" and that "We would like to explore adding these tests to the Stat menu."

60.     On August 25, 2020, Brown used the email address justin.brown@abbottdx.com to contact three employees of LabCorp Employer Services, an Abbott customer whom Abbott

believes Brown met through his work at Abbott.  Brown used the following email signature, falsely representing that he was a "Director, Emerging Technologies" at Abbott:



Brown claimed to be in a "new role, working with emerging technologies that fill gaps in our previous/existing offerings."   Brown described and attached brochures for two COVID-19 diagnostic testing platforms, Bloom Diagnostics' "small point of care, portable COVID-19 antibody test" and LuminUltra's "portable qPCR COVID-19 platform," neither of which are Abbott products.

61.     In furtherance of his scheme to mislead others into believing that he is employed by or otherwise affiliated with Abbott, Brown stated on his profile on LinkedIn.com that between May and August 2020, he worked at Abbott as a "Director, Corporate Accelerator."

62.     When Brown contacted Abbott's customers—including Advent Health, HealthTrust, Hy-Vee, Johns Hopkins Medicine, Stat Technologies, and LabCorp Employer Services—he intentionally or knowingly traded upon Abbott's name and reputation to mislead those customers into making a purchase from him.  In this way, Brown sought in bad faith to profit from Abbott's goodwill.

63.     Brown wrongfully benefitted from his unauthorized use of Abbott's name and the Abbott Marks, which added significant credibility to his offer and Brown's overall sales reputation. Abbott customers' mistaken belief that Brown was still employed by or affiliated with Abbott gave rise to unearned positive inferences about Brown and the products he was trying to sell.

64.     Brown's actions led Abbott's customers to mistakenly believe that the Bloom Diagnostics and LuminUltra COVID-19 diagnostic tests and testing equipment, as well as Brown's attempts to sell those products, were sponsored or approved by Abbott.

### Brown's Unauthorized Use of Abbott's Name, Logo, Address, and Email Signature Design Leads to Confusion and Harm

65.     Since his termination from Abbott, Brown has never been licensed or otherwise authorized by Abbott to use the Abbott Marks, nor any trade names or trademarks confusingly similar thereto, in connection with any goods or services.

66.     Brown's use of "abbott" in his email address domain name, and his use of "Abbott and "  " in his email signature block, are identical to the Abbott Marks in sight, sound, and commercial meaning.

67.     Brown's justin.brown@abbottdx.com email address is confusingly similar to his email address at Abbott, which was justin.brown@abbott.com.   Diagnostics is commonly abbreviated as "Dx."

68.     The overall design of Brown's email signature block is confusingly similar to the email signature block designed by Abbott for use by its employees.

69.     Abbott's standard email signature block design includes the following: on the left side, the trademarked Abbott logo in light blue, , and the trademarked word Abbott in bold black font; to the right of the logo, the individual's name spelled out in light blue and, underneath, the individual's job position spelled out in grey; to the right of the name and position, the Abbott office address—all in grey; to the right of the Abbott office address, the individual's phone number and email; finally, all four sections are enclosed by two grey lines, one above and one below. In combination, these features comprise the distinctive image of Abbott's email signature.

70.     The following shows Abbott's standard email signature block as used by Brown **during his employment** with Abbott:



71.     The following shows the signature block used by Brown in emails to HealthTrust **after he was terminated** from Abbott:



72.     The following shows the signature block used by Brown in emails to HealthTrust and Johns Hopkins Medicine **after he was terminated** from Abbott:



73.     The following shows the signature block used by Brown in emails to HealthTrust and emails to Stat Technologies **after he was terminated** from Abbott:



74.     The following shows the signature block used by Brown in emails to Johns Hopkins Medicine **after he was terminated** from Abbott:



75. The following shows the signature block used by Brown in emails to Advent Health **after he was terminated** from Abbott:



76. The following shows the signature block used by Brown in emails to LabCorp Employer Services **after he was terminated** from Abbott:

77. Brown intentionally designed the signature blocks he used to solicit Abbott's customers after he was terminated from Abbott to imitate the signature blocks of actual Abbott employees and mislead recipients of his emails into believing he is employed by or otherwise affiliated with Abbott.

78. Abbott's design of its email signature is inherently distinctive and has acquired secondary meaning. Its use conveys to recipients that the individual who sent that email is employed by or affiliated with Abbott.

79. The design of Abbott's email signature is also non-functional. Brown could have conveyed truthful information about his job, employer, and contact information without infringing upon Abbott's common law trademark. Brown has no legitimate commercial reason for copying Abbott's design.

80. By registering the domain name abbottdx.com and formatting his email signature block to imitate that of actual Abbott employees, Brown sought to intentionally mislead recipients of his emails into believing that he was still employed by or affiliated with Abbott and that the

products he attempted to sell them—including the Bloom Diagnostics and LuminUltra COVID-19 diagnostic tests and testing equipment—were sponsored or approved by Abbott, even though he knew they were not.

81.     Brown was aware that there is a high likelihood of confusion arising from his use of Abbott's registered and common law marks and used them nonetheless.

82.     On September 25, 2020, Abbott's attorneys wrote Brown a letter demanding that he stop using Abbott's trademarks, discontinue use of abbottdx.com, stop representing himself as affiliated with Abbott, and return the Abbott laptop containing Abbott's intellectual property.

83.     In response to the September 25 letter, Brown purportedly disclosed all the companies he was employed by or had contracts with after Abbott.  Brown's disclosure excludes companies that Brown was working with based on the emails Brown sent to Abbott's customers.

84.     Also in response to the September 25 letter, Brown promised to "not use Abbott's name or logo outside of normal historical employment references."  Brown claimed he had asked his wife to "ship everything back" months before.  Brown further claimed he was "traveling abroad" on a "sensitive" military assignment and could not confirm that his Abbott computer and files had been returned until he got back to the country in "late November/early December." Several days after making this representation, he was photographed at his home in Florida.

85.     Even after Brown promised to stop using Abbott's name, his abbottdx.com email domain remained active.

**COUNT I**
**Infringement of Registered Trademark Under**
**Section 32 of the Lanham Act, 15 U.S.C. § 1114**

86.     Abbott repeats and realleges Paragraphs 1 through 85 as though fully set forth herein.

87.     Abbott is the owner of all right, title, and interest in and to the Abbott Marks.

88.     Brown, without authorization, has used the Abbott Marks (or his reproduction, counterfeit, copy, or colorable imitation of such marks, which were similar in sight, sound, and commercial meaning) in commerce; namely, to sell Bloom Diagnostics and LuminUltra COVID-19 diagnostic tests and testing equipment.

89.     Brown's actions have already caused and are likely to continue causing confusion, mistake, or deception as to the source of origin, sponsorship, or approval of the Bloom Diagnostics and LuminUltra COVID-19 diagnostic tests and testing equipment in that purchasers are likely to believe Abbott developed, sponsored, approved, or otherwise authorized the Bloom Diagnostics and LuminUltra COVID-19 diagnostic tests and testing equipment offered for sale by Brown, or that Brown, Bloom Diagnostics, or LuminUltra are affiliated with or related to Abbott or are authorized by Abbott to sell COVID-19 diagnostic tests and testing equipment in the United States.

90.     One of Abbott's customers, who Brown contacted using his justin.brown@abbottdx.com email address and imitation email signature block in an effort to sell the Bloom Diagnostics COVID-19 diagnostic tests and testing equipment, stated in an email to Brown, "I saw your email was Abbott, and you had the logo, but heard you weren't with Abbott anymore.  I was confused."  Rather than allaying the customer's confusion and admitting that he had been terminated for cause by Abbott on April 13, 2020, Brown intentionally created further confusion by falsely telling the customer that he had recently taken military leave from Abbott and, upon his return, Abbott had reassigned him to a new position within the company.

91.     Another one of Abbott's customers, whom Brown contacted using his justin.brown@abbottdx.com email address and imitation email signature block in an effort to sell the Bloom Diagnostics COVID-19 diagnostic tests and testing equipment, forwarded Brown's

emails to several colleagues and explained, "I received the below email from Justin Brown from Alere/Abbott."

92.     The other Abbott customers to whom Brown sent unsolicited, unauthorized emails likewise were confused about Brown's affiliation with Abbott and whether the Bloom Diagnostics or LuminUltra COVID-19 diagnostic tests and testing equipment that Brown attempted to sell them were in fact approved by or affiliated with Abbott.

93.     Brown's conduct has injured or is likely to injure Abbott's image and reputation with consumers by creating confusion about, and/or dissatisfaction with, Bloom Diagnostics and LuminUltra COVID-19 diagnostic tests and testing equipment.  Furthermore, Brown's conduct has injured or is likely to injure Abbott's image and reputation in this judicial district and elsewhere in the United States by causing diminution of the value of the goodwill associated with the Abbott Marks and a loss of sales and/or market share to Abbott's competition.

94.     Brown committed the described conduct deliberately and willfully, with knowledge of Abbott's exclusive rights and goodwill in the Abbott Marks, and with knowledge of the infringing nature of the marks when used in connection with the diverted COVID-19 diagnostic tests and testing equipment.  Brown's acts have also been committed with bad faith and the intent to cause confusion or mistake and to deceive.  Brown intended to palm off his products as developed or approved by or otherwise affiliated with Abbott.

95.     Brown's intentional infringement of the Abbott Marks and intent to cause confusion is evidenced, for example, by his repeated use of the word "we" instead of "I" to imply that he is employed by or otherwise affiliated with Abbott.  Brown's malicious intent is also evidenced by his multiple false statements in emails and on his LinkedIn profile that after April 13, 2020, he was reassigned or given a new role or position at Abbott instead of terminated.  Brown's malicious

intent is further evidenced by his false statements to Abbott customers that he is authorized to sell Abbott products.

96.     Absent injunctive relief, Abbott has suffered and will continue to suffer great and irreparable injury, loss, and damage to its rights in Abbott's registered trademarks and the goodwill associated therewith, for which Abbott has no adequate remedy at law.  If not restrained, Brown will have unfairly derived and will continue to derive undeserved income, profits, and business opportunities from his infringement.

97.     As Brown's conduct as alleged in this Complaint constitutes infringement of the Abbott Marks under 15 U.S.C. § 1114, and as Abbott has no adequate remedy at law, Abbott is entitled to injunctive relief as well as damages (to the extent calculable) and any other remedies provided by 15 U.S.C. §§ 1116, 1117, and 1118, including costs, reasonable attorneys' fees, and pre-judgment interest pursuant to 15 U.S.C. § 1117.

## COUNT II
## Counterfeiting Under
## Section 32 of the Lanham Act, 15 U.S.C. § 1117

98.     Abbott repeats and realleges Paragraphs 1 through 97 as though fully set forth herein.

99.     Abbott invokes the counterfeit mark provisions of the Lanham Act, 15 U.S.C. § 1117 and seeks the special civil monetary remedies provided therein for Brown's infringing conduct.

100.     Brown's use of the domain name abbottdx.com and his email signature all contain counterfeits of the Abbott Marks.

101.     The marks used by Brown to offer to sell the Bloom Diagnostics and LuminUltra COVID-19 diagnostic tests and testing equipment are identical to, or substantially indistinguishable from, Abbott's registered marks, which Abbott uses in marketing and promoting

its own COVID-19 diagnostic tests and testing equipment. Brown used the marks to intentionally cause confusion, mistake, or deception and to intentionally trade on the goodwill in the Abbott Marks.

102.    Brown's use of counterfeit versions of Abbott's registered marks to sell the Bloom Diagnostics and LuminUltra COVID-19 diagnostic tests and testing equipment was not authorized by Abbott at any time.  Brown is not a licensed user of Abbott's marks or seller of Abbott's products, nor has he been at any time after his termination on April 13, 2020.

103.    As Brown's conduct as alleged in this Complaint constitutes infringement of the Abbott Marks in the form of counterfeiting under 15 U.S.C. § 1117, Abbott is entitled to the special civil monetary remedies provided therein for Brown's infringing conduct, including an award of statutory damages.

**COUNT III**
**False Designation of Origin Under**
**Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)**

104.    Abbott repeats and realleges Paragraphs 1 through 103 as though fully set forth herein.

105.    Abbott is the rightful owner of its registered trademarks and unregistered common law trademarks, including the email signature block designed by Abbott for use by its employees.

106.    Abbott's unregistered common law trademark in its standard email signature block is inherently distinctive and has acquired secondary meaning.

107.    As part of his attempts to sell the Bloom Diagnostics and LuminUltra COVID-19 diagnostic tests and testing equipment in the United States, Brown used Abbott's registered trademarks and common law trademarks, which have caused and are likely to continue causing confusion or mistake or to deceive as to the affiliation, connection, or association of Brown, Bloom Diagnostics, and LuminUltra with Abbott, as to the origin, sponsorship, or approval by Abbott of

27

Bloom Diagnostics and LuminUltra COVID-19 diagnostic tests and testing equipment or of Brown's attempts to sell such products.

108. One of Abbott's customers, whom Brown contacted using his justin.brown@abbottdx.com email address and imitation email signature block in an effort to sell the diverted Bloom Diagnostics COVID-19 diagnostic tests and testing equipment between July and September 2020, stated in an email to Brown, "I saw your email was Abbott, and you had the logo, but heard you weren't with Abbott anymore.  I was confused."  Rather than allaying the customer's confusion and admitting that he was terminated from Abbott on April 13, 2020, Brown intentionally created further confusion by falsely telling the customer that he had recently taken military leave from Abbott and, upon his return, Abbott had reassigned him to a new position within the company.

109. One of Abbott's customer contacts, who Brown contacted using his justin.brown@abbottdx.com email address and imitation email signature block in an effort to sell the Bloom Diagnostics COVID-19 diagnostic tests and testing equipment, forwarded Brown's emails to several colleagues and explained, "I received the below email from Justin Brown from Alere/Abbott."

110. The other Abbott customers to whom Brown sent unsolicited, unauthorized emails likewise were confused about Brown's affiliation with Abbott and whether the Bloom Diagnostics COVID-19 diagnostic tests and testing equipment that Brown attempted to sell them were in fact approved by or affiliated with Abbott.

111. Brown's conduct constitutes a false or misleading representation of fact, as well as a false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

112.    Brown's acts were willfully and intentionally committed with knowledge of Abbott's exclusive rights and goodwill in Abbott's registered trademarks and common law trademarks, as well as with bad faith and intent to cause confusion or mistake and to deceive.

113.    Brown's intentional infringement of Abbott's registered trademarks and common law trademarks and intent to cause confusion is evidenced, for example, by his repeated use of the word "we" instead of "I" to imply that he is employed by or otherwise affiliated with Abbott. Brown's malicious intent is also evidenced by his multiple false statements in emails and on his LinkedIn profile that after April 13, 2020, he was reassigned or given a new role or position at Abbott instead of terminated. Brown's malicious intent is further evidenced by his false statements to Abbott customers that he is authorized to sell Abbott products.

114.    Absent injunctive relief, Abbott has suffered and will continue to suffer great and irreparable injury, loss, and damage to its rights in Abbott's registered trademarks and common law trademarks and the goodwill associated therewith, for which Abbott has no adequate remedy at law.

115.    If not restrained, Brown will have unfairly derived and will continue to derive undeserved income, profits, and business opportunities from his infringement.

116.    As Brown's conduct as alleged in this Complaint constitutes a willful violation of 15 U.S.C. § 1125(a), and as Abbott has no adequate remedy at law, Abbott is entitled to injunctive relief as well as damages (to the extent calculable), and any other remedies provided by 15 U.S.C. §§ 1116, 1117, and 1118, including costs, reasonable attorneys' fees, and pre-judgment interest pursuant to 15 U.S.C. § 1117.

## COUNT IV
### Dilution of Registered Trademark Under
### Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(c)

117.    Abbott repeats and realleges Paragraphs 1 through 116 as though fully set forth herein.

118.    The Abbott Marks are famous and distinctive within the meaning of 15 U.S.C. § 1125(c).

119.    Abbott is one of the world's most recognizable and trusted brands in any industry. Abbott was recently recognized on the Dow Jones Sustainability Index, one of the most prestigious global benchmarks for corporate sustainability, as a Global Industry Leader in sustainability for the seventh consecutive year.  Fortune magazine has named Abbott as one of the World's Most Admired Companies every year since 1984.

120.    The Abbott Marks are widely recognized by the general consuming public of the United States as a designation of source of Abbott's goods, including COVID-19 diagnostic tests and testing equipment.

121.    Since the Abbott Marks have become famous, Brown has utilized marks that are likely to cause dilution by blurring and/or tarnishing the famous Abbott Marks.

122.    Brown committed the described conduct deliberately and willfully, with knowledge of Abbott's exclusive rights and goodwill in the Abbott Marks, and with knowledge of the infringing nature of the marks when used in connection with the diverted COVID-19 diagnostic tests and testing equipment.  Brown's acts have also been committed with bad faith and the intent to cause confusion or mistake and to deceive.  Brown intended to palm off his products as developed, approved by, or otherwise affiliated with Abbott.

123.    Brown's intentional infringement of the Abbott Marks and intent to cause confusion is evidenced, for example, by his repeated use of the word "we" instead of "I" to imply that he is

employed by or otherwise affiliated with Abbott. Brown's malicious intent is also evidenced by his multiple false statements in emails and on his LinkedIn profile that after April 13, 2020, he was reassigned or given a new role or position at Abbott instead of terminated. Brown's malicious intent is further evidenced by his false statements to Abbott customers that he is authorized to sell Abbott products.

124.    As Brown's conduct as alleged in this Complaint constitutes a willful violation of 15 U.S.C. § 1125(c), and as Abbott has no adequate remedy at law, Abbott is entitled to injunctive relief as well as damages (to the extent calculable), and any other remedies provided by 15 U.S.C. §§ 1116, 1117, and 1118, including costs, reasonable attorneys' fees, and pre-judgment interest pursuant to 15 U.S.C. § 1117.

**COUNT V**
**Cyberpiracy Under**
**The Anticybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(d)**

125.    Abbott repeats and realleges Paragraphs 1 through 124 as though fully set forth herein.

126.    Brown's registration, trafficking in, and use of the domain name abbottdx.com and email address justin.brown@abbottdx.com constitutes cyberpiracy or cybersquatting in violation of 15 U.S.C. § 1125(d).

127.    The Abbott Word Marks are distinctive and were distinctive when Brown registered the domain name abbottdx.com.

128.    The domain name abbottdx.com is confusingly similar to the Abbott Word Marks. The confusion is amplified because consumers of Abbott's Rapid Diagnostics business unit recognize "dx" as an abbreviation for the word "diagnostics."

129.    In addition, the Abbott Word Marks currently are famous marks and were famous when Brown registered the domain name abbottdx.com. Abbott is well-known by its customers

for its diagnostics research and development of diagnostic equipment. The domain name abbottdx.com is identical or confusingly similar to and dilutive of Abbott's Word Marks.

130.    Brown had a bad faith intent to profit from Abbott's Word Marks, as evidenced by his use of the abbottdx.com domain name and justin.brown@abbottdx.com email address in attempting to sell products to Abbott's customers and profit from those sales.

131.    Brown's bad faith intent is evidenced, for example, by his repeated use of the word "we" instead of "I" to imply that he is employed by or otherwise affiliated with Abbott. Brown's bad faith intent is also evidenced by his multiple false statements in emails and on his LinkedIn profile that after April 13, 2020, he was reassigned or given a new role or position at Abbott instead of terminated. Brown's bad faith intent is further evidenced by his false statements to Abbott customers coupled with attempts to induce those customers to make purchases from him.

132.    Brown has no trademark or other intellectual property rights in the abbottdx.com domain name. Nor does abbottdx.com consist of Brown's legal name or any other name commonly used word to identify him. Independent from its confusing similarity to Abbott's domain name and appearance as an abbreviation for Abbott Diagnostics, abbottdx.com has no independent meaning, distinction, or fame.

133.    As Brown's conduct as alleged in this Complaint constitutes a violation of 15 U.S.C. § 1125(d), and as Abbott has no adequate remedy at law, Abbott is entitled to injunctive relief to prevent Brown's continued use of the domain name abbottdx.com, including any email addresses at that domain, such as justin.brown@abbottdx.com, cancellation or transfer to Abbott of the domain name abbottdx.com. Abbott is also entitled to damages (to the extent calculable or statutorily authorized), and any other remedies provided by 15 U.S.C. §§ 1116, 1117, and 1118,

including costs, reasonable attorneys' fees, and pre-judgment interest pursuant to 15 U.S.C. § 1117.

## COUNT VI
## Violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836

134.    Abbott repeats and realleges Paragraphs 1 through 133 as though fully set forth herein.

135.    Abbott has many trade secrets related to its confidential marketing strategies, marketing methods, financial information, customer sales lists, pricing methodologies and approaches, and other data.

136.    Abbott derives economic value from these trade secrets because they are not known to Abbott's competitors, thereby allowing Abbott to gain a competitive advantage in the market through the strategies and information it invests in developing.

137.    Abbott maintains these trade secrets as internally confidential by limiting access to a small number of individuals whose role is critical in the development, analysis, or implementation of the information.

138.    Access to this information is not available to Abbott employees who do not have a business need to access the information, and all individuals accessing the information are subject to employee agreements containing non-disclosure obligations and other restrictive covenants.

139.    Brown's unauthorized solicitations were directed at individuals whose identities and contact information were acquired via his employment at Abbott.  As used and maintained by Abbott, such sales lists constitute trade secrets.

140.    Brown used improper means to acquire Abbott's trade secrets and, at the time of disclosure, knew or had reason to know that his use of the trade secret was improper and occurred under circumstances giving rise to a duty to maintain the secrecy of the trade secret pursuant to his

33

Employee Agreement. Brown's unauthorized use of that information therefore constitutes willful and malicious misappropriation of Abbott's trade secrets.

141.    Abbott requests that the Court issue an order providing for the seizure of any property necessary to prevent Brown's continued propagation or dissemination of Abbott's trade secrets, pursuant to 18 U.S.C. § 1836(b). Abbott also seeks injunctive relief to prevent Brown's continued misappropriation of Abbott's trade secrets. Abbott is further entitled to damages (to the extent calculable) for its actual losses caused by Brown's misappropriation and for Brown's unjust enrichment caused by his misappropriation of Abbott's trade secrets, along with any exemplary damages for Brown's willful and malicious misappropriation authorized by 18 U.S.C. § 1836(b)(3).

## COUNT VII
## Breach of Contract

142.    Abbott repeats and realleges Paragraphs 1 through 141 as though fully set forth herein.

143.    The Employee Agreement is a valid and enforceable contract between Abbott and Brown.

144.    Abbott fully performed its obligations under the Employee Agreement.

145.    Brown has breached Section 6 of the Employee Agreement by failing to return Abbott's property and any copies, reproductions, abstracts, or summaries of Abbott's property upon his termination from Abbott. Abbott requested that Brown comply with Section 6 of the Employee Agreement by returning his Abbott laptop and permitting Abbott's third-party vendor to conduct a forensic review of his personal computing devices. Brown's refusal constitutes a breach of the Employee Agreement.

146.    Brown has also breached Section 8 of the Employee Agreement through his unauthorized solicitations of Abbott's customers.    Brown sent emails to individuals whose identities and contact information were acquired via his employment with Abbott.    As used and maintained by Abbott, such sales lists constitute Abbott's Confidential Information (as defined in Section 2(d) of the Employee Agreement) that Brown is contractually bound not to misuse. Brown's unauthorized use of Abbott's Confidential Information constitutes a breach of the Employee Agreement.

147.    Brown has also breached Section 9 of the Employee Agreement, in which he agreed not to participate in, manage, supervise, or provide services to a Competing Business for twelve months after his termination from Abbott.    Upon information and belief, Brown works on behalf of Bloom Diagnostics and LuminUltra, competitors of Abbott in the development and sale of COVID-19 diagnostic tests and testing equipment.    Brown's provision of services for Bloom Diagnostics and LuminUltra constitutes a breach of the Employee Agreement.

148.    Brown has also breached Section 9 of the Employee Agreement, which prohibits him from promoting products in competition with Abbott's products to Abbott's customers.    By attempting to sell the Bloom Diagnostics and LuminUltra COVID-19 diagnostic tests and testing equipment to Abbott's customers, Brown has induced or encouraged those customers not to buy or to buy fewer of the equivalent device from Abbott in direct breach of the Employee Agreement.

149.    Section 9 of the Employee Agreement further prohibits Brown from knowingly inducing or encouraging Abbott customers or covered suppliers to cease, interfere with, or reduce business activity conducted with Abbott.    By attempting to sell the Bloom Diagnostics and LuminUltra COVID-19 diagnostic tests and testing equipment to Abbott's customers, Brown has

induced or encouraged those customers not to buy or to buy fewer of the equivalent device from Abbott, in direct breach of the Employee Agreement.

150.    Brown has continuously violated Section 9 his Employee Agreement since his termination from Abbott on April 13, 2020.  As early as April 15, 2020, Brown began unlawfully soliciting Abbott's customers.

151.    Abbott seeks a court order requiring Brown to comply with Sections 6, 8, and 9 of the Employee Agreement, effective for a twelve-month period after the date of entry of the Order.

152.    Brown agreed in Section 11 of the Employee Agreement that Abbott is entitled to such relief because it will face irreparable injury in the event of a breach or threatened breach of the Employee Agreement.   In addition, Brown acknowledged that the length of time of the restrictive period in Section 9—initially twelve months—would be extended by the length of time that he violates that section.

### COUNT VIII
### Fraud

153.    Abbott repeats and realleges Paragraphs 1 through 152 as though fully set forth herein.

154.    Brown committed common law fraud (under Illinois law) against Abbott by lying about his military leave.

155.    Brown's statement that he was taking a military leave was a false statement of material fact, which Brown knew was false when he made it.

156.    Brown intended Abbott to rely upon the truth of his false statement.

157.    Abbott relied upon the truth of Brown's false statement, paying him $23,749.65 to which he was not entitled because he did not in fact take a military leave as claimed.  Abbott was

damaged in this wrongfully paid amount, which Brown has not repaid to Abbott despite Abbott's request that he do so after discovering he did not in fact take military leave as claimed.

158.    Abbott seeks compensatory damages in the amount of $23,749.65, the damages it sustained from its reliance on Brown's false statement of material fact, along with pre- and post-judgment interest and Abbott's costs, attorneys' fees, and expenses in recovering that amount.

**COUNT IX**
**Unjust Enrichment**

159.    Abbott repeats and realleges Paragraphs 1 through 158 as though fully set forth herein.

160.    By lying about his military leave, Brown retained a benefit to Abbott's detriment in the amount of $23,749.65 in wrongfully issued military leave pay.

161.    Brown's retention of that $23,749.65 violates fundamental principles of justice, equity, and good conscience. Because Brown did not in fact take leave from Abbott in 2019 to serve in the military, he is not entitled to the $23,749.65 in pay that Abbott provided him pursuant to that intentional misrepresentation. Abbott did not issue Brown the $23,749.65 for any other reason than his falsified military leave.

162.    Beyond the injustice and inequity inherent in retaining a wrongfully paid salary, Brown's lies about his military service further violate good conscience by insulting individuals who actually take military leave and diminishing the sacrifices made by those individuals.

163.    Brown had no justification for retaining the $23,749.65 that Abbott paid him based on his lie about taking military leave. Brown performed no work for Abbott nor conferred any benefit upon the company in exchange for the $23,749.65.

164.    Abbott seeks restitution of the $23,749.65 that Brown was unjustly enriched for his falsified military leave, along with pre- and post-judgment interest and Abbott's costs, attorneys' fees, and expenses in recovering that amount.

## PRAYER FOR RELIEF

Abbott respectfully requests that the Court find in its favor and against Defendant Justin Brown and grant Abbott the following relief:

A.    Issue preliminary and permanent injunctive relief requiring Brown to cease using the Abbott Marks, including within his email signature block and within the domain name abbottdx.com and any email addresses with that domain name or confusingly similar domain names, such as justin.brown@abbottdx.com;

B.    Issue preliminary and permanent injunctive relief requiring Brown to cease any and all representations that he is employed by or otherwise affiliated with Abbott, or that he continued to work for Abbott for any period of time after his termination on April 13, 2020, or that he held any titles at Abbott that he did not hold—including any such representations on all social media platforms such as his LinkedIn profile—and inform his current employers, contract partners, customers, and any Abbott customer that he contacted after April 13, 2020, that he currently is not affiliated with Abbott and has not been affiliated with Abbott since April 13, 2020;

C.    Issue preliminary and permanent injunctive relief requiring Brown to deliver to Abbott the Abbott-issued laptop and any Abbott files or other property in his possession, including all Abbott confidential information and Abbott trade secret information;

D.    Issue preliminary and permanent injunctive relief requiring Brown to alert his current employers and contract partners that he has contractual non-compete, non-disclosure, and non-solicitation obligations with Abbott that will not expire until twelve months after the date Brown is enjoined;

38

E.      Issue preliminary and permanent injunctive relief requiring Brown to cease competing with Abbott in violation of this Employee Agreement;

F.      Award Abbott monetary damages to which it is entitled for Brown's infringement and willful dilution of Abbott's registered trademarks up until the date Brown is finally and permanently enjoined from further infringement and dilution;

G.      Award treble damages for Brown's intentional use of a counterfeit trademark;

H.      Award Abbott monetary damages to which it is entitled as a victim of Brown's cyberpiracy up until the date Brown is finally and permanently enjoined from continuing to use the domain name abbottdx.com and any email addresses registered at that domain name, including compensatory damages and statutory damages;

I.      Award Abbott monetary damages to which it is entitled for Brown's misappropriation of trade secrets up until the date Brown is finally and permanently enjoined from further misappropriation;

J.      Award double damages for Brown's willful and malicious trade secret misappropriation;

K.      Award Abbott monetary damages in the amount of $23,749.65 for Brown's fraudulently obtained and unjustly retained military leave pay;

L.      Award Abbott costs, reasonable attorneys' fees, and expenses;

M.      Award Abbott pre- and post-judgment interest on its damages; and

N.      Award such other and further relief as the Court deems just and equitable.

### **JURY DEMAND**

Abbott demands trial by jury on all the claims for damages.

39

Dated: October 20, 2020

Respectfully submitted,

/s/  Ronald S. Safer
Ronald S. Safer, ARDC #6186143
Louis A. Klapp, ARDC #6303722
Mariangela M. Seale, ARDC # 6293433
Valerie H. Brummel, ARDC #6326641
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, Illinois 60602
(312) 471-8700
rsafer@rshc-law.com
lklapp@rshc-law.com
mseale@rshc-law.com
vbrummel@rshc-law.com

*Attorneys for Plaintiffs Abbott Laboratories*
*and Abbott Rapid Dx North America, LLC*